UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.: 8:13-CV-00206

UNITED STATES OF AMERICA,
STATE OF FLORIDA,
ex rel. MICHAEL E. MONTEJO, M.D.,

        Plaintiffs/Relator,

v.

FLORIDA ONCOLOGY NETWORK, P.A.,
and ROBERT J. SOLLACCIO, M.D.,

        Defendants.

_____/

**SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF
UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730) and
FLORIDA FALSE CLAIMS ACT (§68.083 FLA. STAT.)**

On behalf of the United States of America and the state of Florida , Plaintiffs, Michael E. Montejo, M.D. (hereinafter "Dr. Montejo" or "Relator"), Plaintiff/Relator, files this second amended qui tam complaint against Defendants, Florida Oncology Network, P.A. (hereinafter "FON") and Robert J. Sollaccio, M.D. (hereinafter "Sollaccio"), pursuant to 31 U.S.C. § 3729, *et seq.*, as amended and sections 68.081-68.09 of the Florida Statutes to recover all damages, penalties, and other remedies available under the federal False Claims Act and Florida False Claims Act, and alleges as follows:

## I.    INTRODUCTION

### A. Federal and State Law Claims

1.    This is an action to recover treble damages and civil penalties on behalf of the United States of America and the state of Florida in connection with the systematic overbilling of tests, treatments and procedures for patients seeking radiation oncologic treatment in violation of

the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"), and Sections 68.081-68.09 of the Florida Statutes ("Florida FCA").

2.      Adventist Health System Sunbelt Healthcare Corp was a defendant in this case but was dismissed as the claims advanced against it in the previous Amended Complaint on file were settled by the payment of $5,412,502.00.

3.      This matter concerns a significant fraud on the United States government and the state of Florida through the systematic evasion of physician supervision rules whose compliance is necessary to bill for all radiation therapy services for government insured patients.  In addition to the financial impact of the fraud, this conduct of Defendants also paced patients at risk of injury as in the example as illustrated below, a patient was seriously injured.  The center of the fraud demonstrates a disregard for the safety and well-being of patients – individuals who, in hopes of successfully battling cancer, agree to undergo extremely powerful forms of radiation.  By their very nature, these forms of radiation involve inherent risks and danger – most notably the risk of overdose and the risk that radiation will be delivered to the wrong area.  Although patients believe that this treatment is being delivered by capable and qualified medical providers, the radiation is delivered on many occasions without the required physician supervision.   In order to maximize profit, Defendants, at the expense of patient safety, purposely failed to place physicians who are supposed to be supervising the radiation treatment, radiation oncologists, in the facilities while patients were exposed to potentially lethal doses of radiation.  Pursuant to the FCA and Florida FCA, Relator seeks to recover, on behalf of the United States of America and the state of Florida, damages and civil penalties arising from false or fraudulent claims that Defendants submitted or caused to be submitted to government funded health insurance programs. Defendants' false claims induced payments made by Medicare, Medicaid, the Federal

employees Health Benefits Program ("FEHBP"), the managed care component of the United States department of Military Health Systems (TRICARE), and the Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA) and other government funded insurance programs.

4.      At all times relevant hereto, Defendants FON and Sollaccio were enrolled as participating providers in the Medicare program.  In order to enroll in the Medicare program, Defendant FON submitted a Medicare Enrollment Application, Clinics/Group Practices and Certain Other Suppliers, Form CMS 855B, in which Defendant FON certified that:

> *I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti- kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.*
>
> *I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.*

5.      In order to enroll in the Medicare program, Defendant Sollaccio submitted a Medicare Enrollment Application, Physicians and Non-Physician Practitioners, Form CMS 855I, in which he certified that:

> *I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.*
>
> *I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.*

6.     At all times relevant hereto, Defendants FON and Sollaccio were enrolled as participating providers in the Florida Medicaid program and signed Non-Institutional Medicaid Provider Agreements with Florida Medicaid, agreeing to:

> *Comply with local, state and federal laws, rules and regulations applicable to Medicaid, including policy statements for the Medicaid program and the Medicaid Provider Handbooks for Florida Medicaid.*

7.     At all times relevant hereto, Defendant FON and Defendant Sollaccio (collectively "Defendants") have submitted or caused to be submitted claims to, and received payment from both Medicare and Medicaid and other government programs for radiation oncology technical and professional services.  On each claim, Defendants certified that they were in compliance with the applicable regulations.

8.     Defendants repeatedly falsely certified that they were in compliance with the regulatory conditions of participation in, and payment from, Medicare, Medicaid and other government programs, when they know they were not in compliance, thereby knowingly submitting additional false claims to Medicare, Medicaid and other government agencies.

9.     Defendants have violated federal and state law in that they have submitted claims to Medicare, Medicaid and to other government programs for medical treatments and procedures which they had reason to know were not practicing within the realm of the regulations as to who is qualified to perform these treatments and procedures; falsely certified their compliance with the conditions of participation in and payment from Medicare, Medicaid and other government programs when they knew that they were not in compliance with such prerequisites; and failed to return to federal and state governments such payments that they were not entitled to receive and that they knew they were not entitled to retain.

10.     Despite being made aware of the falsity of their claims by Relator, Defendants refuse to make the required refunds to the federal and state governments for these false claims. Defendants have concealed the overpayments that resulted from the scheme and enjoyed the benefits of their fraudulent conduct.  In addition, despite the unethical and fraudulent conduct, Defendants have taken little, if any, action to notify the patients who submitted to inadequately supervised treatments and procedures, or the United States or any state government.

11.     Despite the fact that they were all made aware of this situation by Relator, and instead of making the necessary systematic changes to avoid such pervasive fraud in the future, Defendants continued to bill Medicare, Medicaid and other government agencies for expensive, specifically regulated treatments and procedures and have falsely certified they were following applicable regulations with respect to the proper supervision required to qualify those procedures and treatments for payment.

12.     The end result of these false claims is the unjustified and illegal enrichment of Defendants, detrimental injury of patients, and the corresponding loss of millions of dollars of taxpayer's funds.

13.     On behalf of the United States and the state of Florida, Relator seeks to recover these damages as well as civil penalties arising from the false claims that Defendants caused to be submitted to the United States and the state of Florida, as well as money damages for the wrongful retention of overpayments and refunds that are due and payable to the United States and the state of Florida.

## II.     PARTIES

### A.  Relator

14.     Under the FCA and Florida FCA, a person with knowledge of false or fraudulent claims against the government (a "Relator") may bring an action on behalf of the United States or the state of Florida.

15.     Relator, Michael E. Montejo, M.D., is a citizen and resident of Tampa, Florida. Dr. Montejo graduated Cum Laude with his undergraduate degree from the University of Miami in Coral Gables, Florida where he majored in microbiology and minored in Chemistry and Biology.  Dr. Montejo earned his Medical Doctorate from the University of South Florida, College of Medicine in Tampa, Florida, where he ranked sixth in his class and was inducted into the Alpha Omega Alpha Medical Honor Society.

16.     Dr. Montejo completed his internship in Internal Medicine at the Orlando Regional Medical Center in Orlando, Florida.  Dr. Montejo worked as a resident with the University of Utah Medical Center, Huntsman Cancer Hospital in Salt Lake City, Utah from 2007 through 2011, where he was the Chief Resident from 2010 to 2011.

17.     Dr. Montejo achieved Board Certification in Radiation Oncology while working at Florida Oncology Network, P.A. and Florida Hospital Cancer Institute in Orlando, Florida.

18.     Along with many other accomplishments such as participating in community screening clinics with Huntsman Cancer Hospital, Dr. Montejo has authored publications for peer-reviewed journals on matters relating to gynecologic and head-neck oncology.  Dr. Montejo is a member of the American Society of Therapeutic Radiation Oncology (ASTRO) and the American Brachytherapy Society (ABS).

19.     Dr. Montejo has clinical experience in 3D Conformal Radiotherapy (3DCRT), Intensity Modulated Radiation Therapy (IMRT), Image-Guided Radiation Therapy (IGRT), Stereotactic Radiosurgery (SRS) and Stereotactic Radiotherapy (SRT), Stereotactic Body

Radiation Therapy (SBRT), High-dose rate Breast and Gynecologic Brachytherapy, and other techniques, such as: Eye Plaques and Endobronchial Brachytherapy, Total Body/Skin Irradiation, Intra-operative radiotherapy with HAM applicator, and Breast Intra-operative radiotherapy using Xoft electronic brachytherapy system.

20.    None of the allegations set forth in this Complaint are based on a public disclosure of information in a criminal, civil, or administrative hearing; in a Congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or from news media.  Rather, they are the independent observations and allegations of the Relator.

21.    Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. §3730(e)(4)(B).

**B.  Defendants**

22.    Defendant Florida Oncology Network, P.A. (FON) is a Florida for-profit professional association and was at times herein material the exclusive provider of radiation oncology services for the Florida Hospital Cancer Institute and the Adventist Health System throughout central Florida.  FON is owned by Robert Sollaccio, JMD; Ronald Krochak, JMD; Gary Graham, RMD; David Diamond, AMD; Robert Purdon, LMD; Michael Sombeck, DMD; Alvaro R. Alvarez-Farinetti, MD; Eric L. Saunders, MD; and Jeffrey G. Brabham, MD.  Florida Hospital Cancer Institute provides cancer treatment programs as well as disease prediction and prevention at its hospital facilities located in Orlando, Altamonte Springs, Celebration, Kissimmee, Winter Park, Sebring, Tavares, Daytona Beach, Orange City, Deland, and Palm Coast, Florida.  It offers a comprehensive array of radiation therapy treatment for pediatric and adult cancers.  Each year Florida Hospital Cancer Institute treats more than 3,500 patients, delivering more than 200,000 radiation procedures.

23. FON's principal address is 2501 N Orange Avenue, Suite 181, Orlando, FL 32804. According to the annual reports filed by FON with the Florida Secretary of State, its officers for the years indicated are as follows:

a. **2010** – Robert J. Sollaccio, MD (President), Ronald J. Krochak, MD (Vice President and Secretary), Gary R. Graham, MD (Vice President), David A. Diamond, MD (Vice President), Robert L. Purdon, MD (Vice President), and Michael D. Sombeck, MD (Vice President).

b. **2011** - Robert J. Sollaccio, MD (President), Ronald J. Krochak, MD (Vice President and Secretary), Gary R. Graham, MD (Vice President), David A. Diamond, MD (Vice President), Robert L. Purdon, MD (Vice President), and Michael D. Sombeck, MD (Vice President).

c. **2012** - Robert J. Sollaccio, MD (President), Ronald J. Krochak, MD (Vice President and Secretary), Gary R. Graham, MD (Vice President), David A. Diamond, MD (Vice President), Robert L. Purdon, MD (Vice President), and Michael D. Sombeck, MD (Vice President).

d. **2013** - Robert J. Sollaccio, MD (President), Ronald J. Krochak, MD (Vice President and Secretary), Gary R. Graham, MD (Vice President), David A. Diamond, MD (Vice President), Robert L. Purdon, MD (Vice President), and Michael D. Sombeck, MD (Vice President).

2013 Annual Report amended on September 16, 2013 to add the following officers: Alvaro R. Alvarez-Farinetti, MD (Vice President), Eric L. Saunders, MD (Vice President), Jeffrey G. Brabham, MD (Vice President), and Kelly E. LaFave, MD (Vice President).

e. **2014** - Robert J. Sollaccio, MD (President), Ronald J. Krochak, MD (Vice President and Secretary), Gary R. Graham, MD (Vice President), David A. Diamond, MD (Vice President), Robert L. Purdon, MD (Vice President), and Michael D. Sombeck, MD (Vice President), Alvaro R. Alvarez-Farinetti, MD (Vice President), Eric L. Saunders, MD (Vice President), Jeffrey G. Brabham, MD (Vice President), and Kelly E. LaFave, MD (Vice President).

24. FON employs radiation oncologists. FON has been incorporated since 1994 and has six officers and directors. FON's employees specialize in 3D-CRT (three-dimensional conformal radiation therapy), IMRT (intensity modulated radiation therapy), IGRT (image-guided radiation therapy), High-dose rate brachytherapy, and APBI (accelerated partial breast

irradiation).  FON is divided into two service areas or tiers (Northern and Southern).  While it is based out of Orlando, Florida, FON employed and provided radiation oncologists at the following Florida Hospital Cancer Institute locations and hospitals: The Southern tier includes Winter Park, East Orlando, Orlando, Altamonte Springs and Kissimmee while the Northern tier includes Daytona Beach, Deland, Orange City, Palm Coast, Sebring, and Tavares.

25.    FON billed for professional services rendered by its radiation oncologists.[1]  This included patient consults, follow-ups, treatment planning, special procedures (stereotactic radiosurgery and brachytherapy), implant procedures, image guidance review, and on-treatment visits.  The facility where the procedures were provided would bill for all of the technical services, to include radiation therapists, oncology nurses, radiation physicists, and for the use of the equipment.

26.    Defendant Robert J. Sollaccio, M.D. (Defendant Sollaccio) is a Florida licensed medical doctor who is believed to reside at 9100 Kilgore Road in Orlando, Florida.  According to a biography posted on FON's website, Defendant Sollaccio is board certified in radiation oncology and received his medical degree at the University of Florida.  Defendant Sollaccio is listed as both the President and registered agent for Defendant FON and refers to himself publically as an owner of FON.  Importantly, Defendant Sollaccio served as the Medical Director of the Department of Radiation Oncology at Florida Hospital Cancer Institute at all times relevant hereto.  Defendant Sollaccio also served on the Governance Council of Florida Hospital Cancer Institute.

27.    At all times herein material, Defendant Sollaccio managed, oversaw and directed the delivery of radiation oncology services on behalf of FON in Central Florida.  His duties

---

[1] FON owns the equipment at Sebring and leases space from Florida Hospital.  As such, FON bills both the technical and professional services at Sebring.

included supervising the physicist, dosimetrist, radiation technicians, and other support staff in the diagnosis, simulation, and radiation treatment; treating patients with radiation therapy through development of treatment plans and ongoing participation in and review of patients' therapy; supervising the maintenance of the medical records; ensuring quality control; and executing other documents on behalf of FON; recruiting radiation oncologists and most pertinent to the instant matter, managing the scheduling and coverage of radiation oncologists.

## III.   JURISDICTION AND VENUE

28.   Jurisdiction is proper in this Court because Relator seeks remedies on behalf of the United States for multiple violations of 31 U.S.C. §3729. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Sections 1331, 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

29.   This Court has personal jurisdiction over all Defendants because they reside in, transact business in, or can be found in the Middle District of Florida and because the acts complained of herein occurred in the Middle District of Florida.

30.   Venue is proper in the Middle District of Florida pursuant to 31 U.S.C. § 3732(a) because all Defendants can be found in, reside in, and transact business in the Middle District of Florida, and because  the acts alleged herein to be in violation of 31 U.S.C. § 3729 occurred in the Middle District of Florida.

## IV.   THE NATURE OF THE CASE

31.   When a patient arrived at a Florida Hospital Cancer Institute location for radiation treatment, a detailed consultation and treatment plan was outlined prior to receiving radiation. The FON physician conducted a number of treatment planning procedures including simulation[2]

---

[2] Simulation is a process by which the radiation treatment fields are defined, filmed and marked out on a patient's skin.

and target delineation. The hospital would also have a medical physicist assist in the treatment planning. The treatment plan was custom-tailored to the patient and was designed to achieve the treatment objectives of the radiation oncology physician.

32. A typical treatment plan would include radiation treatment five days a week (sometimes twice per day) and ranging from 1-8 weeks in duration. Frequently radiotherapy was given concurrently with chemotherapy to enhance effectiveness. The radiation oncologist supervised the delivery of radiation to the patient and was responsible for verification and documentation of the accuracy of treatment delivery in accordance with the initial treatment planning and setup parameters. The radiation oncologist also supervised the position of the treatment target using image guidance (IGRT) when appropriate, via ultrasound, x-rays or CT scans.

33. The patient would be seen by the radiation oncologist physician every five treatments to evaluate the patient's progress, assess toxicity, and decide if treatment should proceed, cease, or be modified. These evaluations are called on-treat visits (OTV) and are required every five treatments for all patients. FON utilized a pre-printed sheet that the radiation oncologist physician would fill out during the OTV visit with the patient. On this document, the physician must verify that any image-guidance had been reviewed and make decisions about the current treatment plan and determine if the treatment plan should be continued, interrupted, discontinued, or modified. During the OTV the radiation oncologist could potentially prescribe controlled substances, request a consultation with other physicians, coordinate hospital admission if necessary, or order other services (i.e. imaging, intravenous fluids, oxygen, lab tests, etc.). A radiation therapist (or technician) administers the daily radiation treatment to the patients under the supervision of a physically present and immediately available radiation

oncologist.  Due to the highly specialized nature of radiation oncology, the Centers for Medicare and Medicaid Services (CMS) rules require that a radiation oncologist must be physically present and immediately available, providing direct supervision and be able to intervene if necessary during radiation therapy.

34.     Non-physician providers do not have the required detailed knowledge of clinical radiation oncology, radiobiology, and physics to supervise the delivery of radiation.  Non-physician providers do not have the scope of knowledge required to provide appropriate medical evaluation, interpretation of complex imaging and laboratory testing, and the decision-making and requisite medical management skills that are acquired over years of medical training.  Only the radiation oncologist possesses the skills necessary to supervise radiation therapy.

35.     Nurses, physician assistants and other non-physician providers sometimes participate in the care of patients receiving radiation therapy, typically by providing assistance in the management of some of the minor side effects patients may experience during treatment. These efforts do not constitute comprehensive weekly management.  Only a radiation oncologist is qualified to incorporate both the clinical and technical aspects of weekly management of patients.

36.     The on-treat visit was performed on each patient receiving external beam treatment (conventional, 3D CRT or IMRT) and was billed under CPT code 77427 (also referred to as radiation therapy weekly management).  These weekly on-treat visits are more than just an evaluation and management of treatment related symptoms.  The total care of a patient during the radiation treatment course requires understanding and integration of both clinical and technical aspects of the radiation treatment plan.  The radiation oncologist must be able to understand and recognize consequences of treatment, appropriately manage the associated toxicities, and be able

to execute oncologic clinical judgment regarding the treatment plan and make modifications as needed.  While on-treat visits are to be performed and documented at least once per five treatments (and are reimbursed only once per five treatments), it is important to understand that performance of an OTV (or any component of an OTV) may be required at any time during the course of radiation therapy and that the CPT code 77427 is intended to reimburse the radiation oncologist for his/her immediate availability and performance of any OTV service during the previous five treatments.

37.     It was common practice for FON to provide services or treatments without a radiation oncologist present.  In fact, several Florida Hospitals serviced by FON did not have a radiation oncologist scheduled to be at the facility during days when radiation treatment was being administered to patients.    For example, Relator was scheduled to work only two shifts a week at the Kissimmee location, and no other radiation oncologist was scheduled or present at the facility on the three days Relator was not there.  Relator treated approximately 15-20 patients at the Kissimmee location per day and this number occasionally grew into the 30's.

38.     The Orlando East facility, located at 7727 Lake Underhill Drive in Orlando, was staffed with radiation oncologist Michael D. Sombeck, 1/2 day per week. No other physicians were scheduled to be in the building.  This facility treated 10-15 patients per day.  When a radiation oncologist was not scheduled or available, radiotherapy and image guidance procedures carried on unsupervised by a radiation oncologist.  It is believed that FON attempted to utilize emergency physicians located at the main hospital to meet the supervisory requirement, which is not permitted by CMS rules.

39.     The Altamonte Springs facility, located at 601 E. Altamonte Drive in Altamonte Springs, regularly treated 40-70 patients per day.  Radiation oncologist Eric L.

Saunders was typically onsite for 4-5 days a week. When a radiation oncologist was not scheduled or available, radiotherapy and image guidance procedures carried on unsupervised by a radiation oncologist. Occasionally a non-physician practitioner was utilized to meet the supervisory requirement and even perform on-treatment visits. Upon information and belief, occasionally FON attempted to utilize a group of unaffiliated medical oncologists (Dr. Ambinder), who was not qualified to supervise radiotherapy and image guidance procedures, who happened to share the building to meet the supervisory requirement.

40.    The Winter Park facility, located at 2100 Glenwood Drive in Winter Park, regularly treated 40-50 patients a day. Radiation oncologist David A. Diamond was scheduled for 4-5 days per week, but sometimes less. When a radiation oncologist was not scheduled or unavailable, radiotherapy and image guidance procedures carried on unsupervised by a radiation oncologist. Occasionally, a non-physician practitioner was utilized to meet the supervisory requirement. It is believed that occasionally FON attempted to utilize a group of unaffiliated and as alleged above, unqualified, medical oncologists (Dr. Zhengebot, Dr. Grow, Dr. Molthrop, Dr. Shroff, and Dr. Dunn) who happened to share the building to meet the supervisory requirement.

41.    The Sebring facility, located at 4416 Sun N' Lake Blvd. in Sebring, regularly treated 10-15 patients per day. Despite being one of the smallest volume practices, FON staffed this facility with a radiation oncologist physician at all times. As FON collected all technical revenue at this site in addition to the professional services revenue, this site provided the largest financial return per patient. At this site FON physicians ordered treatments that were not supported by documented need, rather they were done solely for profit. Examples include image

guidance for palliative cases (i.e. whole brain radiotherapy) and ordering IMRT for breast lumpectomy boosts as a routine practice.

42.     The Tavares facility, located at 4000 Waterman Way in Tavares, was staffed by two radiation oncologists, Dr. Jeffrey G. Brabham and Dr. Robert L. Purdon.

43.     The Daytona Beach facility, located at 301 Memorial Medical Parkway in Daytona Beach, was staffed by radiation oncologist Dr. Ronald J. Krochak.

44.     The Orange City facility, located at 1055 Saxon Boulevard in Orange City, and the Deland facility, located at 680 Peachwood Drive, DeLand, Florida, were simultaneously covered by a single radiation oncologist, Dr. Gary R. Graham.

45.     The Palm Coast facility, located at 60 Memorial Medical Parkway in Palm Coast, was staffed by radiation oncologist Dr. Alvaro Alverez-Farinetti.

46.     The Orlando facility, located at 2501 N. Orange Avenue, Suite 181 in Orlando, regularly treated 80-100 patients per day. Radiation oncologists Robert J. Sollaccio or Michael D. Sombeck were on site five days a week for coverage, but often with only one doctor supervising all external beam RT plus brachytherapy simultaneously. In addition, Dr. Michael D. Sombeck covered the Orlando East location ½ day per week.

47.     In order to maximize profits and minimize overhead, Defendants knowingly circumvented the CMS requirement for a radiation oncologist to be at the facilities identified above by purporting to have non-physician practitioners, medical oncologists, or emergency room physicians (who happened to practice within their specialties within the same building or on the same hospital campus) serve as physician supervisors of radiotherapy in place of an actual radiation oncologist. These acts constitute a violation of the supervision requirements set forth

in the CMS rules for supervision by a clinically appropriate physician of incident-to services, a category to which radiotherapy belongs.

48.     CMS clearly specifies that a physician with the ability to respond to an emergency alone but otherwise does not have the scope of training or hospital privileges to direct radiotherapy procedures do not qualify as a clinically appropriate provider to supervise radiotherapy.  Non-physician practitioners, medical oncologists, and emergency room physicians do not receive training in radiation therapy, and they would not have the capabilities or even the privileges provided by the hospital to perform tasks that may be required of a radiation oncologist during radiotherapy service.  On a routine basis, non-federally insured patients were treated with no physician at all in the clinic, while patients with government sponsored insurance programs were routinely placed under the supervision of a clinically unqualified physician or non-physician practitioner.

49.     In addition to the violations of CMS and State rules and guidelines, Relator became increasingly concerned for patient safety.  Defendants were continually made aware of the scheduling issues by Relator.  In May 2012, Relator sent an email to Defendant Sollaccio as President of FON, as well as the Medical Director of the Department of Radiation Oncology for the Florida Hospital Cancer Institute and to Dr. Eric Saunders, a senior partner in FON.  In the email, Relator discussed his discomfort in only spending two days per week at the Kissimmee location and stated he was worried that patient care would suffer.

*From: **Michael Montejo** <michaelmontejo@gmail.com>*

*Date:       Thu,        May        17,        2012       at       11:53        AM*
*Subject:*
*To:         elsaunders721        <elsaunders721@gmail.com>,        "Robert      Sollaccio,      MD"*

*<rjSollacciomd@gmail.com>[3]*

*Eric and Bob,*

*I just wanted to mention that I am seeing 10 consults in Kissimmee this week (5 tues and 5 scheduled for Fri) plus all of the follow-ups and OTVs. I also saw 2 at WPUA plus all follow-ups and OTVs. If things will continue at this pace, than I am not comfortable only being in Kiss 2 days/week. It is my feeling that this justifies more physician time esp. if a significant number of fridays will be tied up with IORT in the AM. I am hopeful that we can discuss some changes to my clinic schedule so as to better distribute physician time to where the patient volume is, esp. since the cases at Kiss are more complex and require more attention. (eg I saw 1. breast 2.neuroendocrine brest 3. uterine rhabdo 4. oral cavity t4 Sqcc and 5. leptomeningeal relapse of SCC on tues alone.) At this rate, I am worried that pt care will begin to suffer....on tues I felt very frustrated. I think we need to discuss.  Mike*

50.     Defendant Sollaccio responded the next day stating that patient volumes have been very low at Kissimmee.  Defendant Sollaccio stated "Kissimmee has been very slow, with under beam[4] numbers dipping in the low teens."     Defendant Sollaccio continued and stated "if you average 10 NPCs/week (new patient consults), numbers should be 35-45/day."

51.     After this exchange of emails with Defendant Sollaccio, there was a follow-up meeting to discuss the staffing levels at Kissimmee.  Relator spoke of the complexities of the patients he was caring for and pushed for at least one more day at Kissimmee.  During the meeting, Defendant Sollaccio determined that there would be no increase in physician coverage at Kissimmee.  After the meeting was over, Defendant Sollaccio spoke to the Relator in private and told him that he would "never become a partner at FON if they increased the physician coverage at Kissimmee."  Defendant Sollaccio told the Relator that he would not be able to cover

---

[3] *rjsollacciomd@gmail.com*  is the email address for Defendant Sollaccio.
[4] Under beam means those cancer patients receiving radiation treatment.

his overhead if he was at Kissimmee more than two days a week. The message was sent loud and clear that staffing would be kept low to maximize profits.

52.     Three months later Relator sent Defendant Sollaccio and Dr. Saunders another email describing his problems with the scheduling at Kissimmee. He discussed the complexities with patient care and Relator's need to be present at least one more shift a week. Relator also referred to an incident where a patient sustained an injury at the facility and was refused medical attention by the presumed supervising on-scene medical oncologist who was sharing the same clinic space. Relator complained also that often there were no doctors or nurses present when patients were being treated.

> *From: **Michael Montejo** <michaelmontejo@gmail.com>*
> *Date: Sat, Aug 25, 2012 at 12:54 PM*
> *Subject: Days off request*
> *To: "Robert Sollaccio, MD" <rjSollacciomd@gmail.com>, elsaunders721 <elsaunders721@gmail.com>*
> *Bob and Eric,*
> *After reviewing the schedule, I want to bring to your attention that in Kissimmee we have been holding pretty consistently around 19-20 pts. I just simulated 7-8 pts ...its seems to be getting busier, and I think we will be in the mid-20's hopefully soon. I think it is appropriate to increase my days there to x3/week. As I have mentioned before, I do not feel comfortable carrying in the 20's with only two days per week. As you are aware, Kiss treats complex patients (ie chemoradiation and SBRT on a limited basis.) It is my view that these patients require greater access to the treating radiation oncologist (esp HN pts). Moreover recent events have demonstrated that Premier Oncology does not take responsiblity for supervising the patients in the radonc clinic (eg we recently had a pt who sustained a fall in the radonc clinic, Premier refused to eval pt, and to worsen the situation Jackie scheduled NO nurse to be present. The pt ultimately sustained a fracture of the fifth metatarsal and was referred to ortho). There have abeen other days, where pts are being treated with no physician or nurse. I need this situation to be addressed because I feel this causes undo exposure to me.*

*As an aside, regarding holiday coverage, I am ok with not taking vacation days during the weeks of christmas or thanksgiving, but I would appreciate if I could be covered to attend ASTRO this year.*

*Please let me know how you think best to proceed,*

*Mike*

53.     Several days later (August 31, 2012), Relator received a response back from Defendant Sollaccio.  Defendant Sollaccio responded that the Kissimmee situation would be addressed by the department.  Defendant Sollaccio stated the patient volumes had been staying in the high teens with an occasional peak in the twenties and that a meeting was planned for later in the month upon the return of another doctor from vacation.  Despite serving as Medical Director of the Department of Radiation Oncology for the Florida Hospital Cancer Institute, Defendant Sollaccio stated the lack of nurse care at the facility was an "HR issue" and that "we need to remain neutral and leave the RN coverage issue to them."  Defendant Sollaccio added that he regularly treats patients without a full time nurse.

54.     In Relator's experience at the Kissimmee location, the average radiation therapy course consisted of 28 once-daily treatments per patient.  Approximately one-half of the patients he saw at Kissimmee were treated utilizing IMRT or intensity modulated radiation therapy and approximately two-thirds utilized IGRT or image-guided radiation therapy.

55.     IGRT is an extra daily imaging procedure that is used by radiation oncologist physicians to accurately target radiation treatment beams.  This must be specifically ordered by the radiation oncologist physician, it provides for a daily professional reimbursement to the radiation oncologist physician, and is typically reserved for select cases when treating areas of the body that are prone to movement, such as the lungs (affected by breathing), liver, prostate gland, as well as tumors located close to critical organs such as the spinal cord.  This procedure

is performed *prior to radiation delivery* and is used to ensure proper alignment and targeting of radiation beams.  IGRT is performed in the treatment room prior to the patient receiving radiation therapy treatment and the radiation oncologist physician must be physically present in the clinic to direct the beam targeting as needed.

56.     Medicare rules state that radiation oncologist physicians can perform off-line reviews of image guidance (IGRT), but that they must be present in the facility or clinic where the radiation treatments are being administered by the radiation therapist.  For example, a radiation therapist may have trouble lining up the image-guidance properly, thus needing a radiation oncologist physician to intervene and exercise clinical judgment on how to proceed with respect to patient positioning and beam targeting. Another reason that a radiation oncologist physician should be available at the clinic is in the event that a CT (Computed Tomography) scan is used for image guidance because radiation therapists are not trained to interpret three-dimensional volumetric imaging, which is often not intuitive, and will routinely require physician support and involvement.

57.     Off-line review means that while a radiation oncologist physician is required to be physically present and immediately available to direct the beam targeting *prior to* treatment delivery, it is permitted that the documentation of the review of image guidance occur after-the-fact. Radiation oncologist physicians can bill government sponsored health plans a daily professional charge per patient for performance of image guidance. In Kissimmee, approximately 60–70% of patients would get image guidance as part of their treatment. It was routine practice that Defendants were not present during image-guided radiation therapy and were simply performing their off-line reviews remotely from other sites. In these instances, no radiation oncologist was available to assist the ancillary technicians with beam targeting prior to

treatment or any other aspect of the radiation therapy, yet they continued to bill daily for this service. They circumvented the essence of image guidance, which is the ability to benefit patients from real-time targeting of the radiation beams *prior to treatment delivery*, and to have the radiation oncologist available to direct this process.

58.    An example of the fiscal impact of the fraud perpetrated by FON, and Sollaccio on a representative case load of 30 patients at the Kissimmee location is illustrated below:

| | |
|---|---|
| 30 patients x 28 fractions = | 840 fractions |
| estimated avg. $400 per fraction = | $336,000 |
| | |
| 20 patients (IGRT) x 28 fractions = | 560 image guidance procedures |
| image guidance cost $50 x 560 = | $28,000 |
| | |
| Total = | $364,000 |
| Portion that was unsupervised = | x .6 |
| | **$218,400 per 30 patients** |

59.     These estimates are for unsupervised image guidance procedures (professional) and radiation treatment delivery (technical) only and do not include inappropriate charges for OTVs or other unsupervised technical procedures (ie CT-simulations). As detailed above, Kissimmee was not the only understaffed facility operated by FON.  The examples of treatments provided at Kissimmee which are described in Paragraphs 60-89 are but a sampling of the total universe of overbilling for treatments and services which were not administered under the supervision of a radiation oncologist.

60.    Patient 001[5] was treated for a locally advanced anal squamous carcinoma. Patient 001 received simultaneous chemotherapy and radiation totaling approximately 6000cGy in 33 fractions over 6.5 weeks of daily image-guided IMRT. This patient developed significant skin

---

[5] To protect the privacy of the patients, the names have been replaced with a patient identifier. The identities will be disclosed to the parties and the Court at the request of the Court in accordance with an appropriate protective order.

toxicity requiring treatment breaks and even hospital admission and subsequent narcotic pain management.

61.     Patient 002 was treated for locally advanced hypopharyngeal squamous carcinoma. Patient 002 required simultaneous chemotherapy and radiation totaling 7000 cGy in 35 fractions over 7 weeks of daily image-guided IMRT. Patient 002 also required a re-simulation and re-plan after significant regression of his tumor. He required narcotic pain management.

62.     Patient 003 was treated for inflammatory (very aggressive) breast cancer. She received post-mastectomy radiotherapy. She underwent daily image guidance radiotherapy to 5040 cGy 28 fractions to the chest wall and nodal fields utilizing 3d-CRT followed by an en face electron boost to mastectomy scar region for addition 5 fractions, bringing total dose to 6040 cGy in 33 fractions over 6.5 weeks.

63.     Patient 004 was treated for locally advanced synchronous squamous carcinoma in her left maxillary sinus and supra-glottic larynx. She received concurrent cetuximab (infused drug) with radiotherapy via image guided IMRT with dose-painted integrated boosts. She was prescribed 6600 cGy in 30 fractions. She experienced significant toxicity requiring hospital admission. She developed and oral staphylococcal infection with subsequent bacteremia and expired during her radiotherapy course.

64.     Patient 005 was treated for locally recurrent high-grade pleomorphic sarcoma of the left rhomboid, re-resected with close margins. Patient 005 received post-operative radiotherapy to the surgical bed via en face electron technique to 5000 cGy/25 fractions. This was followed by field reduction and boost to 6600 cGy/33 fractions over 6.5 weeks. While this patient did not receive image guidance, this is an example of a 'clinical set-up' where the physician visualization of the actual light fields on the skin is very important for proper targeting.

Without a radiation oncologist present for this procedure, it is possible that the treatment area would have been misplaced.

65.    Patient 006 was treated for a locally advanced supraglottic-laryngeal carcinoma with extension to hypopharynx. He received simultaneous chemotherapy and radiation with daily image-guided IMRT to 6600cGy/30 fractions over 6 weeks with dose-painted integrated boosts. This patient developed significant laryngeal edema threatening his airway and necessitated initiation of steroid therapy and close monitoring.

66.    Patient 007 was treated for Stage IIb non-Hodgkin's lymphoma of Waldeyer's ring, primary-refractory to chemotherapy. This patient received salvage radiotherapy of 4000 cGy/20 fractions to a reconstructed pre-chemotherapy tumor volume with subsequent field reduction and boost to PET-CT avid persistent disease to total dose 5000 cGy/25 fractions over 5 weeks with daily image guided IMRT. He developed significant nausea and weight loss requiring treatment interruption and referral to gastroenterology for upper endoscopy.

67.     Patient 008 received post-operative radiotherapy for resected squamous carcinoma of the retro-molar trigone (oral cavity). He received a total dose of 6300 cGy/30 fractions over 6 weeks with daily image guided IMRT and dose-painted integrated boosts.

68.    Patient 009 received 5000 cGy in 20 fractions for skin cancer, targeting two sites. Left nasal ala (partial re-irradiation from prior treatment) and left cheek were treated via en face electron technique, another example where physician presence for clinical set-up and visualization of light fields on the skin is important.

69.    Patient 010 received whole brain radiotherapy for brain metastasis, 3000 cGy/10 fractions over 2 weeks of 3DCRT palliative radiotherapy.  There was no image guidance.

70.     Patient 011was treated for locally advanced high risk prostate cancer. He received an initial course delivering 5600 cGy to seminal vesicles and 5040 cGy to pelvic lymph nodes, all with image guided IMRT in 28 fractions. This was followed by boost for dose escalation to prostate alone to 7800 cGy in 39 fractions also with daily image guidance.

71.     Patient 012 was treated for early stage laryngeal cancer.  He received radiotherapy alone, 6525 cGy in 29 fractions over 6 weeks via image guided 3D-CRT.

72.     Patient 013 was treated for locally advanced breast cancer.   Her treatment was post-operative whole breast and nodal radiotherapy at 5040 cGy in 28 fractions via image guided 3D-CRT followed by 3D-CRT boost to lumpectomy cavity, for total 6040 cGy in 33 fractions over 6.5 weeks.

73.     Patient 014 was treated for advanced uterine rhabdomyosarcoma. She received post-operative simultaneous chemotherapy and radiation to 5040 cGy in 28 fractions with daily image guided 3D-CRT to the pelvis. This was followed by image-guided IMRT pelvic node boosts. Escalating total dose to 5940 cGy in 33 fractions over 6.5 weeks. She was scheduled to receive vaginal brachytherapy boosts at the main cancer center in Orlando.

74.     Patient 015 was treated for post-operative pelvic radiation for resected cervix cancer, 5040 cGy in 28 fractions over 5.5 weeks via image guided 3D-CRT. This was followed by vaginal brachytherapy boost at main cancer center in Orlando.

75.     Patient 016 was treated for prophylactic cranial radiation for small cell carcinoma of the lung. The treatment totaled 2500 cGy in 10 fractions over 2 weeks via 3D-CRT with daily image guidance. The whole brain fields needed to be safely matched to prior fields treating up to the skull base from a prior oral cavity cancer. This case represents a perfect example of the radiation oncologist needing appropriate and adequate time in the clinic in order to obtain and

review prior treatment fields to ensure not over dosing a critical structure, the spinal cord in this case.

76.     Patient 017 was treated for early stage breast cancer, 5040 cGy in 28 fractions via 3D-CRT followed by x5 fraction lumpectomy boost, totaling 6040 cGy in 33 fractions over 6.5 weeks.

77.     Patient 018 received palliative pelvic radiation for bone metastasis, total 4500 cGy in 18 fractions 3D-CRT over 3.5 weeks.

78.     Patient 019 received simultaneous chemotherapy and radiation for locally advanced lung cancer (non-small cell carcinoma). 7000 cG/35 fractions via image guided 3D-CRT over 7 weeks.

79.     Patient 020 was treated for locally recurrent bladder carcinoma after prior radical cystectomy. This patient received approx. 6480 cGy/36 fractions with concurrent chemotherapy. The initial 3D-CRT pelvic fields were followed by an IMRT boost. The patient also required resimulation and re-plan for tumor dimension change along with daily image guidance with KV pair and cone-beam CT.

80.     Patient 021 was treated for locally recurrent orbital low grade lymphoma, left.  He received 3240 cGy/18 fractions utilizing image-guided IMRT. Patient 021 required treatment interruption and a referral to ophthalmology during therapy due to radiation induced conjunctivitis. Increased final dose to 3240 cGy from initially planned 3060 cGy to compensate for treatment interruption.

81.     Patient 022 was treated for Stage IV non-Hodgkin's lymphoma.  He received consolidative radiation after chemotherapy to the left distal femur. 3000 cGy/15 fractions 3DCRT followed by field reduction and boost to PET-CT residual disease to 4000 cGy/20

fractions 3DCRT. Daily image guidance due to tight margins utilized to minimize dose to knee joint space.

82.     Patient 023 was treated for multifocal anaplastic large cell lymphoma of skin, two sites treated (bilateral flanks). Site#1 tangential 3D-CRT, 5000 cGy/25 fractions, dose escalated due to sluggish tumor response. Site #2, en face electron field, 4400 cGy, 22 fractions.

83.     Patient 024 was treated for breast cancer. Approximately 5040 cGy/28 fractions 3D-CRT, followed by 5 fraction boost (total 33), all 3D-CRT.

84.     Patient 025 was treated for breast cancer. Approximately 5040 cGy/28 fractions 3D-CRT, followed by 5 fraction boost (total 33), all 3D-CRT.

85.     Patient 026 was treated for squamous carcinoma left external auditory canal. Received local radiation, image-guided IMRT, daily KV imaging + cone-beam CT for image guidance. Initially 6600cGy/33 fractions, increased to 7000cGy/35 fractions due to treatment interruption for radiation induced skin reaction, noted during treatment. This patient required pain management with narcotic analgesics.

86.     Patient 027 had end stage metastatic disease, and received whole brain radiotherapy palliatively, referred to hospice during therapy. 3000 cGy/10 fractions, 3D-CRT. No image guidance.

87.     Patient 028 was treated for breast cancer. Approximately 5040 cGy/28 fractions 3D-CRT, followed by 5 fraction boost (total 33), all 3D-CRT.

88.     Patient 029 was treated for breast cancer. Approximately 5040 cGy/28 fractions 3D-CRT, followed by 5 fraction boost (total 33), all 3D-CRT.

89.     Patient 030 was treated for locally advanced lung (non-small cell carcinoma), stage IIIa. Received radiation totaling 7000 cGy/35 fractions over 7 weeks with daily image

guidance. Planned field reduction and boost after approximately 4600 cGy. Also received concurrent chemotherapy.

90.     The thirty case summaries from Kissimmee which are set forth above are but a sample of the total universe of patients who received unsupervised treatment at facilities operated by FON.  The patient counts and related damages for unsupervised treatments will be proportionately larger at the larger facilities.   There were numerous times that facilities were unattended due to the scheduled radiation oncologist taking vacation or sick time and when FON did not provide a radiation oncologist for back up or coverage.

**The Use of Medical Radiation: Risks and Consequences**

91.     Americans currently receive far more medical radiation than ever before; in fact, the average lifetime dose of diagnostic radiation has increased sevenfold since 1980.[6]  Although radiation therapy often constitutes an effective treatment for tumors, the use of radiation as a potential cure for cancer carries significant and sometimes fatal risks. The risks associated with radiation therapy continue to increase despite the advancements in radiation therapy technology. In fact, according to Dr. John Feldmeir,  a radiation oncologist at the University of Toledo and a leading authority on the treatment of radiation injuries, approximately one in twenty patients receiving radiation therapy will suffer injuries.[7]

92.     The most serious risk associated with radiation therapy is the risk of a radiation overdose. Radiation overdoses may be caused by machine malfunctions or may result from violations of safety regulations. The consequences of a radiation overdose can range from mild skin burns to organ failure and even death. An overdose may also damage the cells lining small blood vessels, depriving the skin and soft tissue of nourishment and resulting in wounds that

---

[6] Walt Bogdanich, *The Radiation Boom: Radiation Offers New Cures, and Ways to do Harm,* N.Y. TIMES, Jan. 24, 2010, *available at* http://www.nytimes.com/2010/0l/24!health/24radiation.html?pagewanted=all.
[7] *Id.*

resist healing. Additionally, once the soft tissue is injured as a result of an overdose, bone death is common.

93.     In 2005, a hospital located in Florida disclosed that seventy-seven brain cancer patients received fifty percent more radiation than prescribed because one of its linear accelerators had been programmed incorrectly for nearly a year.[8]  In 2009, Cedars-Sinai Medical Center in Los Angeles disclosed that it had accidentally exposed more than 260 patients to eight times the normal dose of radiation for CT brain scans over an eighteen month period.[9]

94.     Despite their prevalence, studies show that radiosurgery accidents are chronically unreported.  In January 2010, The New York Times reported the results of its investigation into 621 radiation mistakes that occurred in New York State between 2001 and 2008.[10]  In 284 of the cases, radiation used for a particular medical treatment missed all or part of its intended target or treated the wrong body part entirely. Of these cases, fifty patients received radiation intended for someone else, including one brain cancer patient who received radiation intended for breast cancer.  Another patient with stomach cancer was mistakenly treated for prostate cancer.[11]

95.     Overall, the New York Times investigation focused primarily on two cases that profoundly illustrate the true nature of the risks and consequences associated with medical radiation.[12]  In early 2005, Scott Jerome-Parks was diagnosed with a cancerous tumor, found at the base on his tongue.  After discussing his treatment options with his doctor, Mr. Jerome-Parks opted to have stereotactic radiosurgery delivered by a linear accelerator. Mr. Jerome-Parks' first four radiation treatments were delivered without incident, but his doctor wanted to re-work the

---

[8] *Id.*
[9] Andrew Zajac and Alan Zarembo, *Radiation Worries Prompt FDA to Regulate Medical Scanners,* HOUSTON CHRON., Feb. 10, 2010, at A3.
[10] Walt Bogdanich, *The Radiation Boom: Radiation Offers New Cures, and Ways to do Harm,* N.Y. TIMES, Jan. 24, 2010, *available at* http://www.nytimes.com/2010/0l/24/health/24radiation.html?pagewanted=all.
[11] *Id.*
[12] *Id.*

radiation plan. On the morning of March 14, 2005, the medical physicist assigned to Mr. Jerome-Parks' case revised the treatment plan using the linear accelerator's software.

96.     Shortly after 11:00 a.m., as the medical physicist was trying to save the new treatment plan, the computer began seizing up and displaying error messages, which asked whether the physicist wanted to save the changes to the treatment plan before the program aborted; the physicist answered yes. At 12:24 p.m., the doctor approved the new treatment plan, and Mr. Jerome-Parks was prepped for his treatment.  At 12:57 p.m., just six minutes after yet another computer crash, the first radiation treatment under the new treatment plan began.

97.     Friends and family of Mr. Jerome-Parks immediately became concerned when they observed the severe swelling of Mr. Jerome Parks' head and neck following these two treatments. Only after this third treatment under the new plan, however, did the medical physicist check to see whether Mr. Jerome-Parks was being radiated correctly.  The results of her investigation revealed that the multileaf collimeter - the device that was supposed to precisely focus the radiation on the tumor - was wide open.  As a result, Mr. Jerome-Parks' neck, from the base of his skull to his larynx, had been exposed to seven times the amount of prescribed radiation.

98.     After an investigation into the cause of the overdose, it was discovered that the linear accelerator's software had not saved the instructions for the collimeter.  Importantly, this mistake could have easily been discovered by anyone monitoring the computer screen during the radiation treatment - the screen clearly indicated that the collimeter was wide open.

99.     The three consecutive days of radiation left Mr. Jerome-Parks deaf, mostly blind, unable to swallow, nauseated, in severe pain, burned, with his teeth falling out, with ulcers in his mouth and throat, and finally, unable to breathe. He died in 2007 at the age of 43.

100.    Soon after the radiation overdose occurred, New York state officials cautioned hospitals to be extremely careful with linear accelerators.  The same day the alert went out, however, a 32-year-old breast cancer patient named Alexandra Jn-Charles absorbed the first of twenty-seven consecutive days of radiation overdoses.[13]  Each overdose constituted three times the prescribed dose of radiation.

101.    The linear accelerator used to deliver Ms. Jn-Charles' radiation did not use a multileaf collimeter but instead used a simpler beam-modifying device called a wedge – a metallic block that serves as a filter.  Although the radiation treatment seemed to be going well, towards the end of the therapy, Ms. Jn-Charles developed a sore on her chest.  When Ms. Jn-Charles arrived for her twenty-eighth and final treatment, the radiation therapist took her to see a radiation oncologist.  The only thing he told her was that she would not be receiving any more radiation and that she could go home.

102.    Two weeks after Ms. Jn-Charles' last radiation treatment, the hospital decided to investigate the possible causes of her injuries.  The investigation was short and revealed a deadly mistake: the linear accelerator's software was missing a vital command--to insert the wedge.  Without the filter, Ms. Jn-Charles' treatment team had been mistakenly scalding her with three and half times the prescribed radiation dose in each and every session.  As with Mr. Jerome Parks, the fact that there was a mechanical error was clearly displayed on computer screens during the treatments.  The error, however, went unnoticed.

103.    The overdose resulted in a festering wound that would not heal.  Despite sessions in a hyperbaric oxygen chamber and several reconstructive surgeries, the wound continued getting considerably worse.  Meanwhile, her cancer returned with a vengeance. After several months of pain that was so intense that she considered suicide, Ms. Jn-Charles died.

---

[13] *Id.*

104.   The deadly consequences of radiation-related errors can be tempered - if not completely eliminated - by compliance with applicable safety standards and training requirements.

105.   Defendants' drive to maximize profit by improperly and unlawfully understaffing facilities with radiation oncologists endangered patients and has resulted in tragic consequences. Too many patients are overseen by too few qualified radiation oncologists at multiple sites and the consequences can be, and were in one situation, disastrous.  The case of Ms. C, a patient at one of Defendants' facilities, exemplifies this point all too well.

106.   In 2004, Ms. C was diagnosed with breast cancer and sought treatment in Puerto Rico where she received a radical right breast mastectomy.  The cancer diagnosis was Stage II (T2N1).  The tumor was 4.7 cm and there were two positive nodes.  She underwent both chest-wall radiotherapy and chemotherapy during her initial treatment.  She developed metastatic disease to the thoracic spine requiring palliative radiation to a field encompassing the ninth through eleventh thoracic vertebrae, which was completed at Osceola Cancer Center from July 29, 2009 to August 11, 2009.  She remained stable until March 2011, when she re-presented with same bony metastasis in the thoracic spine.

107.   At this time, she was evaluated by former FON physician, Dr. Rahul Chopra, at FHCI Kissimmee, who outlined a course of treatment re-irradiating the previously treated area in the thoracic spine (T9-T11)---not knowing that this site had been previously irradiated.  Dr. Chopra documented on the chart a request for the patients' previous treatment records.  Dr. Chopra was covering multiple other clinics the same week, was in Kissimmee only two days and apparently failed to reconcile the patients' radiotherapy treatment history before approving his prescribed course to the thoracic spine. The re-irradiation occurred from March 23 to April 13,

2011. Relator believes that Dr. Chopra may not have been afforded the ability to be present during Ms. C's CT-simulation. This is critically important because, had he been present, than he may have been able to prevent this disaster. The simulation process is a physical interaction with the patient that often reveals evidence of prior treatment from a simple inspection of the skin for any permanent radiation-targeting tattoos that would have indicated previous radiotherapy to the body site in question.  During part, if not all of this period, it is believed that Ms. C's treatment was covered by Medicaid.

108.    Ms. C was referred to Relator in November 2012 at Kissimmee for a discussion of further radiation.  She was paraplegic at this time.  Dr. Montejo obtained Ms. C's prior records and uncovered that she had been over-radiated as the aggregate radiation dose of both treatment courses to T9-T11 (2009 and 2011) exceeded spinal cord tolerance. He reported this as the cause of her paraplegia.  Notably, she also exhibited avid enhancement of the spinal cord on serial thoracic spine MRI imaging, the length and location of which corresponded to the treated radiation fields and was radiographically consistent with radiation necrosis of spinal cord.

109.    Following the re-irradiation at Kissimmee in March-April 2011, Ms. C began to have some early signs, but it took about six months for the spinal cord injury to cause the paraplegia.  This is the time period one can expect from over-radiation to the spinal cord. Unfortunately, as a result of this additional radiation treatment to the spinal cord, Ms. C's paraplegia is permanent.  None of Ms. C's healthcare providers have revealed to her that she was over radiated, or that her paraplegia is the result of over radiation.

110.    Tragically, today Ms. C is paraplegic.  She has no ability to move below the waist and has no bladder or bowel function. She is confined to a bed and is dependent on her family to assist with activities of daily life.  She is not able to use a bath or shower and as a result they

must give her sponge baths at home.  She does have use of her arms and hands.  Neurologically this is consistent with thoracic spinal cord injury.

111.    Dr. Chopra treated Ms. C at the facility located at Kissimmee.  He was assigned to Kissimmee two days a week and then traveled to other locations for the rest of the week.  Dr. Chopra complained about not getting more shifts at Kissimmee to treat his patients.  Dr. Chopra voiced his concern to FON management about needing more shifts at Kissimmee in order to give adequate care but was never granted his request.  Dr. Chopra was moved by FON management to the Sebring location where he stayed approximately five months before resigning in December 2011.  When Dr. Sollaccio cut Dr. Chopra down to two days per week in Kissimmee, Dr. Chopra had not yet become board certified in radiation oncology, and was only 6 months out from completing his radiation oncology residency.

112.    In August 2012, Florida Hospital determined that multiple patients had been treated in the Winter Park facility without a physician present.  An investigation by Florida Hospital also found that numerous patients carried Medicare or Medicaid as a secondary payer or the medical plan that they were using did not have Medicare or Medicaid in their name.

113.    Brenda Large is a former FON employee who left to work for Adventist/Florida Hospital.  Ms. Large is responsible for capturing all radiation oncology billing for Florida Hospital.  In an email dated September 4, 2012, Ms. Large provided the following information to several on-site administrators and to Larry Ponce, the Administrative Director for the Florida Hospital Cancer Institute Radiation Oncology department:

> *"The physician needs to be onsite for all government insurances, Medicare, Medicaid, Champus, and Tricare.  There are many Medicare and Medicaid replacement plans that do not have Medicare or Medicaid in the name, so we need to be careful of that as well."*

Larry Ponce responded to this email thanking Brenda Large for her research and concluded "physician needs to be onsite to treat."  Despite being warned by Florida Hospital of the need to comply with government rules regarding supervised  treatments, Defendants continued to fail to abide by the rules.

114.    On December 3, 2012, David Banks, Senior Vice President, Florida Hospital sent a letter to Defendants regarding a breach of the Radiation Oncology Professional Services Agreement.



FLORIDA
HOSPITAL
2400 Bedford Road
Orlando, Florida 32803
(407) 303-8585

December 3, 2012

VIA HAND DELIVERY

Florida Oncology Network, P.A.
Attention: Robert Sollaccio, M.D, President
1300 West Oak Street
Kissimmee, FL 34741

RE:  *Breach Notification*

Dear Dr. Sollaccio:

Notice is hereby given of breach of the Radiation Oncology Professional Services Agreement ("Agreement) by you.  Specifically, you have failed to provide on-site coverage as described in Section 3.4 and Exhibit 3.4 of that agreement.

Pursuant to Section 10.1.4, this is a Material Breach.  Failure to cure this breach within 60 days following receipt of this notice may result in termination of that Agreement.

Very truly yours,

David Banks, *Senior Vice President*

cc:  Wendy Anderson, Esq.

115.    Defendants knowingly and intentionally evaded Medicare rules and regulations that required a radiation oncologist to be on the premises during all radiation treatment by

utilizing clinically unqualified physicians to fulfill the supervisory requirement established by Medicare and Medicaid.  In the Kissimmee treatment center, FON shared building space with a group of medical oncologists.  This group was composed of three medical oncologists who formed a company called Premier Oncology that contracted with the Florida Hospital Medical Group (FHMG) to provide medical oncology services to Florida Hospital.  Defendants utilized the medical oncologists to purportedly satisfy the Medicare requirement that a physician be present during radiation treatments.  As mentioned, CMS rules and regulations are specific in that the physician must be capable of providing direction and be in a position to intervene if required during radiotherapy treatment.  The Premier Oncology physicians did not meet this requirement and do not have clinical privileges to perform the necessary professional services.

116.    Radiation oncologists are physicians specifically trained to utilize radiotherapy for therapeutic purposes (most often for treating cancer).  Radiation oncology training consists of a one-year internship (medical or surgical) followed by four years dedicated solely to the use of radiotherapy.  This includes training in clinical oncology as well as indications for benign diseases.  There is training focused on radiotherapy technique including coursework in the physics of electromagnetic and particle forms of radiation as well as the physical interactions of these processes with human living tissue.  There is training in applied physics including x-ray generation and function of a linear accelerator, principles of isocentric beam targeting and field shaping, understanding and execution of complex treatment planning (3D conformal therapy or intensity modulated therapy or electron therapy), understanding of radiation dose distribution in living tissue, understanding appropriate occupational and patient centered safety protocols, understanding and being able to implement appropriate patient simulations and setups with image guidance when appropriate.  Training also includes coursework in radiobiology

with meaningful knowledge and understanding of biological effects of radiation. These include tumor and/or normal tissue radiation dose effects, fractionation effects, time and/or dose effects on tumor cell kinetics. Furthermore, this includes understanding of the theory behind the radiation interactions with concomitant radiosensitizing chemotherapy or other biologic agents that are often administered in conjunction with radiotherapy to enhance cure rates, but also increase toxicity. On any given day, a radiation oncologist is expected to be able to assist with and direct patient setups for radiotherapy (often requiring review of the patients radiotherapy plan), perform simulations in preparation for radiotherapy, perform complex treatment planning (including target delineation, field placement and/or shaping, dose prescription, designating non-target organ tolerance limits), perform image guidance, assess and manage radiation toxicity and make decisions about whether treatment interruption, modification, or discontinuation is indicated.

117. Medical oncologists and emergency room physicians are not adequately trained to supervise radiotherapy. Medical oncologists do a combined two to three year fellowship in solid tumor oncology (medical oncology) and hematology (blood disorders and liquid tumors). Their expertise becomes therapeutic application of chemotherapy (infused drugs) and targeted biologics for management of both benign and cancer disease. They receive no training in radiation therapy and would not have the capabilities to perform tasks that may be required of a radiation oncologist during radiotherapy service.

118. Emergency room physicians similarly receive no training in the clinical and technical application of radiotherapy.

119. At no point did the medical oncologists accept responsibility or liability for the patients receiving radiotherapy during those times when a radiation oncologist was not present.

Pursuant to CMS rules, the medical oncologists could not provide direct supervision and in fact, are not qualified to accept any responsibility for patients receiving radiotherapy, and more significantly, they were not even aware that they were supposed to be supervising patients receiving radiotherapy.  Direct supervision requires that the supervising physician be physically present, immediately available and for the physician within his scope of practice the knowledge, skill and ability to perform the service or procedure.   Medical oncologists that worked in the Kissimmee location did not have the appropriate scope of practice nor hospital granted privileges to perform radiotherapy service.  Defendants' attempts to use such medical personnel were merely a sham and fraudulently contrived scheme to get around Medicare rules and regulations. To illustrate the fact that non radiation oncologists neither accepted nor were they aware that they were expected to be supervising radiotherapy, a cancer patient receiving radiation at Kissimmee broke her foot during a visit for treatment when she sustained a fall when the so-called supervising medical oncologist at the facility was asked to render aid, the oncologist refused to render treatment. Defendant Sollaccio drafted the following language regarding 'Non-Emergency Coverage' in his physician supervision policy which was disseminated to the physician members of FON for approval on 10/25/2011:

2. **Non-Emergency Coverage:**

    a). <u>Supervising Physicians Responsibilities for non-Emergency Care:</u>

      i.  A physician or qualified provider who is interruptible, immediately available and is not a Radiation Oncologist **does not have responsibility** to handle matters pertaining to radiation treatments for example:  directing RO staff on treatment set-ups, patient positioning, approval of images for the purpose of verifying beam targeting, and/or side effects of radiation treatment in a non emergency situation.

120.     The email exchange below discovered an upcoming visit to Florida Hospital by personnel with the Centers for Medicare and Medicaid Services due to an issue in the emergency room.  This email demonstrates once again that Defendants knew of the Medicare rules for

physicians to be onsite for treatment and created the illusion that the radiotherapy facilities were being staffed properly.   The hospital administration at Florida Hospital were asking that FON provide coverage at all sites during the upcoming week when the CMS inspectors were scheduled to be on the hospital campuses.

*From: <docsom@aol.com>*

*Date: Wed, Sep 28, 2011 at 12:03 PM*

*Subject: Re: COVERAGE SCHEDULE 10/3-10/7*

*To: rjSollacciomd@gmail.com, erica.charest@flhosp.org, Lindsay.Best@flhosp.org, Larry.Ponce@flhosp.org, dagdmail@yahoo.com, lafavekelly@gmail.com, michaelmontejo@gmail.com, arcarojb@yahoo.com, rlpurdon@yahoo.com, jeffrey.brabham@gmail.com, Michele.Carr@flhosp.org, dluce507@yahoo.com, elsaunders721@cfl.rr.com, garygrahammd@yahoo.com, docsom@aol.com*

*CMS has scheduled a visit to FH tri county next week, apparently due to issues in th ER. Administration had asked us to provide coverage at all sites next week during pt treatment.*

*Here is tha schedule:*

|              | Kissimmee | East (PM only) | WP  |
|--------------|-----------|----------------|-----|
| Mon 10/3     | Julie A   | KEL            | JB  |
| Tues 10/4    | ELS       | MDS            | JB  |
| Wed 10/5     | Debi L.   | KEL            | DAD |
| Thurs 10/6   | Debi L.   | MEM            | DAD |
| Fri 10/7     | MEM       | KEL            | DAD |

*Please confirm that you received this email, and thanks for all the flexibility!*

*Mike S.*

121.   Physician extenders, also known as Physician Assistants or Nurse Practitioners, were placed on the schedule in lieu of radiation oncologist physicians.  The above email shows that two positions are filled by 'Julie A.' and 'Debi L.'.  These names are short hand references to Julie Arcaro and Debi Luce, physician assistants (or physician extenders).   This email

demonstrates Physician Assistant coverage and care of patients without the appropriate physician overview or supervision.

122.    The weekly assessment by radiation oncologist physicians of radiotherapy patients is a critical part of the overall treatment plan that was custom-tailored for the patient. The weekly meetings are used to evaluate the patient's side effects, recommend treatments for those side effects (such as medication), and address any concerns the patient may have.  As treatment progresses, the radiation oncologist may make changes in the schedule or treatment plan depending on the patient's response or reaction to the therapy.  FON utilized a preprinted sheet for the radiation oncologist physician to fill out that captures the physician's assessment of the treatment plan.  The radiation oncologist must certify that all image guidance has been reviewed and make decisions to continue, modify, interrupt, or discontinue radiation treatment. Physician extenders are not clinically qualified to make these decisions on patient treatment.

123.    The American Medical Association publishes the current procedural terminology (CPT) codebook which contains a listing of descriptive terms and identifying codes for reporting and billing medical services and procedures performed by physicians.  Each year the CPT codebook is revised.  The specific code that captures weekly on-treat visits is 77427 (Radiation Treatment Management).  The CPT codebook provides specific guidelines and requirements that must be met in order to bill for this treatment to include review of port films, review of dosimetry, dose delivery, treatment parameters, review of patient set-up and the examination of patient for medical evaluation and management.  A physician extender or physician assistant cannot perform these tasks, yet FON regularly used physician extenders or physician assistants to do just that.

124.	The email below describes additional shifts that were covered by a physician assistant who is being directed to conduct patient under treatment exams.

> From: **Robert Sollaccio, MD** <*rjSollacciomd@gmail.com*>
> Date: Mon, Jan 9, 2012 at 5:16 PM
> Subject: Re: Availability to Cover 1/16-1/20
> To: Debi Luce <*dluce507@yahoo.com*>
> Cc: gary graham <*garycherise@bellsouth.net*>, elsaunders721
> <*elsaunders721@gmail.com*>, "Kelly LaFave, MD" <*lafavekelly@gmail.com*>, "Michael
> Montejo (michaelmontejo@gmail.com)" <*michaelmontejo@gmail.com*>, Julie Arcaro
> <*arcarojb@yahoo.com*>, robert purdon <*rlpurdon@yahoo.com*>
> **Thanks. You should consider consolidating to 1/2 day for f/us at each location. It
> makes planning simpler and allows for a condensed schedule.  Dr. LaFave will be in
> OC on Monday afternoon and Tuesday morning. Dr. Montejo will be in Deland on
> Wednesday afternoon.**
>
> **It would be helpful if Julie could assist at South on Monday and Tuesday. I'll be at
> the WPU center Monday P.M. and Tuesday A.M. Having her there will allow me to
> have IPCs seen without unnecessary work placed on Dr. Sombeck. If she could see
> my UTs on Monday afternoon I will co-sign and touch base with them on Tuesday.
> Tomorrow I can let you both know how Dr. Saunders and I will be splitting up
> Thursdays. I anticipate my days falling opposite breast tumor board.**
>
> **Thanks for the flexible schedule.**
>
> **Bob**
> **Robert J. Sollaccio, M.D.**
> **Florida Hospital Cancer Institute**
> **Radiation Oncology Division**
> **2501 N. Orange Avenue, Suite 181**
> **Orlando, FL 32804**

125.	The email above reveals that Julie Arcaro (Physician Assistant) was on shifts at Florida Hospital South (aka Orlando).  In the email, Defendant Sollaccio requested that Julie Arcaro meet with his UTs (patients under treatment) and then he would co-sign the charts the next day.

126.	An August 24, 2012, email and attachment from Defendant Sollaccio entitled "Coverage 8/27-12/16/2012," outlines a shift at Altamonte Springs during the week of 9/4/12. The attachment reads: "Jessica 9/4 to see OTVs, KL to sign off on 9/5."  The Jessica referenced

in this email is Jessica Boland, a Physician Assistant.  Defendant Sollaccio indicated in the email that Jessica Boland will meet with OTVs (patients under treatment) for their weekly visit. Defendant Sollaccio goes on to state that KL, who is FON radiation oncologist physician Kelly LaFave, will sign off on the charts on 9/5.

127.    The Centers for Medicare and Medicaid Services provide specific guidelines relating to physician supervisory requirements.  The Medicare Benefit Policy Manual requires that outpatient radiation therapy and diagnostic testing services must be performed under the supervision of a physician.  Depending on the services rendered, the appropriate level of physician supervision is required.  The levels in question in this suit involve direct and personal supervision where physician attendance is required somewhere on the premises or in the room at the time of the procedure.  Direct supervision requires that the physician be immediately available and interruptible in an emergency or to be able to assist with the procedure if needed. Personal supervision requires that the physician be physically present in the room during the procedure.

128.    The American Society of Radiation Oncologists (ASTRO).  ASTRO acts as the academic regulatory body of radiation oncology.  ASTRO produced a white paper in May 2011 entitled "Medicare's Physician Supervision Requirements."  The white paper tracks and uses language from CMS policies and reinforces the guidelines established by the CMS for radiation oncologists.  ASTRO's guidance is specific as to the supervisory physician.    ASTRO and Medicare both state the supervisory responsibility is more than the capacity to respond to an emergency.  Medicare clearly defines this physician requirement as being a "supervising physician who must have within his scope of practice the knowledge, skill and ability to perform

the service or procedure, hospital privileges specific to that service or procedure, and be able to provide additional doctor's orders."

129.    ASTRO recently published on its web site a question that discussed whether or not a radiation oncologist could bill the radiation management CPT code 77427 without performing the "Hands-on," "Face-to-face" weekly examination.

> **Coding Question:** *Can the radiation oncologist bill the radiation management CPT® code 77427 without performing the "Hands-on," "Face-to-face" weekly examination? The nurse practitioner performs the weekly exams and the doctor will review her dictation and co-sign the dictation. Is the weekly exam satisfied if the radiation oncologist greets the patient in the hall, waiting room or verifies treatment setup in the treatment room? Those of us who are ROCC certified and agree to process 77427 charges knowing our standard of care is as mentioned above—what will happen to us?*

> **Coding Response:** *A nurse practitioner or administrative assistant cannot bill for CPT code 77427 and physicians can only bill for services they perform. To be able to charge a 77427, a radiation oncologist must evaluate the technical and clinical aspects of the treatment and have a face to face E/M type interaction with the patient and document the evaluations and the resulting management decisions.*

130.    Defendants' actions have caused federal and state funded health care programs to lose millions of taxpayer funds and their actions have deprived patients of receiving cancer treatment at the level of care that is expected (and required) in the United States.

## V.    THE FALSE CLAIMS ACT

131.    The FCA, 31 U.S.C. Sections 3729-33, provides for the award of treble damages and civil penalties for, inter alia, knowingly submitting or causing the submission of false or fraudulent claims for payment to the United States Government and for making or using false statements material to false or fraudulent claims paid by the United States.  31 U.S.C. Sections 3729(a)(1), (2) (2006); 31 U.S.C. Sections 3729(a)(1)(B) (West 2012).1  Because the conduct in this complaint may have occurred from 2007 through the present, this complaint expressly incorporates both the pre-FERA and post-FERA provisions of the FCA.

132.     The pre-FERA FCA provides, in pertinent part, that:

*(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .*
*(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729 (2006).*

133.  The post-FERA FCA provides, in pertinent part, that:

*(a)(1) any person who – (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;  (B) knowingly makes, uses,  or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal  Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.*
*(b) For purposes of this section, (1) the terms "knowing" and "knowingly" mean – (A) that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud . . . .31 U.S.C. § 3729 (West 2012).*

134.     The standard of proof under the FCA is preponderance of the evidence.  31 U.S.C.

§ 3731(c) (2006); 31 U.S.C. § 3731(d) (West 2012).

**REGULATION OF PAYMENT FOR RADIATION ONCOLOGY SERVICES**

**A.     MEDICARE**

135.     The United States Medicare Healthcare Program (hereafter "Medicare") is a

federal health insurance program for persons aged 65 or older, persons with permanent kidney

failure, and persons receiving Social Security disability benefits.

136.    Overall responsibility for the administration of Medicare, as authorized by 42 U.S.C. § 1395, et seq., (hereafter "Social Security Act or SSA"), resides with the Secretary of the Department of Health and Human Services (hereafter "HHS").

137.    Within HHS, the responsibility for administration of the Medicare program has been delegated to the Centers for Medicare and Medicaid Services (hereafter "CMS"). Medicare provides two basic types of coverage – hospitalization insurance (commonly known as Medicare Part A) and medical insurance (commonly known as Medicare Part B).

138.    Part A hospital insurance provides coverage for inpatient hospital charges, post-hospital extended care for 100 days following hospital discharge, and hospice care. Part B medical insurance covers physician services, home health services, most skilled nursing home services, and other non-hospital related medical services. 42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

139.    The federal government provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS. To assist in the administration of Part B of the Medicare Program, CMS contracts with Medicare administrative contractors (MACs). 42 U.S.C. § 1395u. MACs are responsible for processing the payment of Part B claims to providers on behalf of CMS. Id. First Coast Service Options, Inc. (First Coast), a Florida corporation, is the MAC responsible for the payment of Part B claims to Defendants on behalf of CMS in Florida.

140.    Florida providers claim Medicare Part B reimbursement from First Coast pursuant to written provider agreements. First Coast receives, processes, and pays or rejects those claims according to Medicare rules, regulations, and procedures.

141.    At all relevant times hereto, Defendants signed or caused to be executed provider agreements with Medicare that permitted Defendants to submit claims and accept payment for services provided by Defendants.

142.     As a condition of participation in the Medicare Part B program, providers agree to be familiar with, and abide by, the program's reimbursement policies.  In particular, when Defendants submitted their Medicare Enrollment Applications, Defendants certified to the following requirements:

> *I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.   The Medicare laws, regulations, and program instructions are available through the Medicare contractor.   I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.*
>
> *I agree that any existing or future overpayment made to the supplier by the Medicare program may be recouped by Medicare through the withholding of future payments.*
>
> **I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.**   *(emphasis added).*

143.     Accordingly, Defendants had a duty to be knowledgeable of the statutes, regulations, and guidelines regarding coverage for Medicare services, which include the policies relevant to radiation oncology and related services.

144.     Defendants certified in their provider enrollment applications that they were knowledgeable regarding Medicare's requirements.

145.     Medicare covers and participating providers agree to submit claims, only for services that are medically necessary to diagnose and treat illness or injury, and for which the provider maintains adequate supporting documentation, for example, physician's orders, physician's review of work, and other pertinent documentation corroborating the treatment administered.  42 U.S.C. §1395y(a)(1)(A).

146.    Absent certain exceptions, Medicare Part B does not cover, and providers agree not to submit claims for, services provided that are not necessary, not appropriately administered, or not properly documented.

147.    In short, in order for Defendants to be properly reimbursed for patient care by the Medicare program, CMS requires that the treating physician order the applicable services, appropriately document the justification and administration of those services, submit only those codes that correlate with the notes made by the physician in the medical record, and that the physicians adhere to coding guidelines when assigning applicable codes.

148.    After enrollment as a Medicare health care provider, Medicare assigns each participating provider a unique billing National Provider Identifier ("NPI").  Here, FON, and Sollaccio both had NPI numbers.

149.    A physician who treats a Medicare patient is required to submit an electronic or hard-copy Medicare Health Insurance Claim Form (CMS form 1500) to the carrier, here First Coast, who on behalf of CMS, pays for a portion of the claim.  During all times set out in this complaint, Defendants have been required to submit these CMS-1500 forms electronically.

150.    When filing the electronic equivalent of the CMS-1500, a provider certifies that:

*...the services shown on this form were medically indicated and necessary  for the health of the patient and were personally furnished by me or were furnished incident to my professional service  by  my  employee  under  my immediate  personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.*

**MEDICAID**

151.    The state of Florida provides medical assistance and other related services, as outlined by Title XIX of the Social Security Act, to low income families, children, and pregnant women as well as other persons determined to be categorically eligible for such benefits.

152.    The Florida Agency for Health Care Administration (AHCA) has responsibility for administration of the Florida Medicaid program. Fla. Stat. § 409.902 (2002).

153.    Florida Medicaid makes payments for various categories of medical services rendered on behalf of its recipients.  These services include, but are not limited to, outpatient hospital services and physician services.  Fla. Stat. § 409.905 (2007).

154.    AHCA has contracted with HP Enterprise Services (HP) in Tallahassee, Florida to serve as its Fiscal Agent, processing and paying Medicaid claims.  Claims submitted to HP for Florida Medicaid reimbursement are to be completed and paid in accordance with Florida law and Florida Medicaid rules and regulations.  AHCA and/or HP distribute Florida Medicaid rules and regulations to providers participating in the Florida Medicaid program.  AHCA and HP also provide the rules and regulations via their Florida Medicaid websites.

155.    Florida Medicaid providers submit claims to the Fiscal Agent on the electronic equivalent of the CMS-1500.    See AHCA, Florida Medicaid Provider Reimbursement Handbook, CMS-1500.

156.    Claim payments are made by Florida Medicaid via electronic bank transfer.  By accepting receipt of claim payments by electronic transfer, the provider certifies that the claims for which the payment was received were made in compliance with all provisions of the paper CMS-1500 form and all applicable federal and state laws.   The paper CMS-1500 form specifically provides that a physician's signature on the claim form for purposes of submission of a claim to Florida Medicaid makes the following certification:

> *I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.*

157.    The provider's signature on the claim form also certifies to Florida Medicaid that:

*information entered on the claim is in conformance with the conditions on the back of the claim form and with all federal and state laws and regulations. State laws and regulations include the regulations applicable to the Medicaid program, including the Medicaid Provider Handbooks issued by AHCA.  ACHA, Florida Medicaid Provider Reimbursement Handbook, CMS-1500, 1-24 (October 2003).*

158.    Further, the CMS-1500 includes a certification on the back that applies to all providers submitting the form:

*This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents or concealment of a material fact may be prosecuted under applicable Federal or State law.*

159.    A portion of every payment by Medicaid includes funds provided to the State of Florida from the United States of America.  Consequently, a percentage of all Medicaid payments made to Defendants as set out herein come from federal funds.

**TRICARE**

160.    TRICARE is the federal health care system for uniformed service members, retirees, and their families worldwide. TRICARE, formerly known as CHAMPUS, is a federal health benefits program, established by 10 U.S.C. Sections 1071-1110, that offers a triple option benefit plan: an HMO option; a PPO option; and a fee for service option.

161.    The regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying, to the extent practicable, the same reimbursement scheme and coding parameters that the Medicare program applies.  10 U.S.C. Sections 1079(j)(2)(institutional providers), (h)(1)(individual health care professional) (citing 42 U.S.C. § 1395, et seq.).   Services and supplies that are not medically or psychologically necessary for the diagnosis or treatment of a covered illness or injury are specifically excluded from coverage.  32 C.F.R. § 199.4(g)(1).

162.    TRICARE providers are obligated to provide services which are "(i) furnished at the appropriate level and only when and to the extent medically necessary . . .; (ii) of a quality that meets professional recognized standards of health care; and, (iii) supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." 32 C.F.R. § 199.6(a)(5).

163.    TRICARE prohibits improper billing practices such as unbundling and fragmenting as a means of manipulating CPT codes to increase reimbursement; misrepresenting the dates, frequency, duration, description of the services involved, or the identity of the person who rendered the services; and overutilization of services. 32 C.F.R. § 199.9(c). Such practices are considered fraudulent and abusive and a misrepresentation of services. 32 C.F.R. Sections 199.9(c)(1) - (c)(13).

164.    Overall responsibility for the administration of TRICARE resides with the Secretary of the Department of Defense (DOD). The DOD has contracted with Humana Military Healthcare (Humana) for administration of the TRICARE program in the South Region, which includes Florida. Humana subcontracted with Palmetto Government Benefits Administrators, LLC (PGBA, LLC) to process claims for several states, including Florida.

165.    In order to participate, Defendants filed service provider applications wherein they certified that they would comply with TRICARE policy and regulations.

166.    As part of the TRICARE billing process, Defendants filed CMS form 1500s whereon they certified:

> *I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.*

**CMS MEDICAL CODING AND REQUIREMENTS FOR RADIATION ONCOLOGY**

167.    Radiation oncology is a cancer treatment wherein ionizing radiation is utilized to control malignant cells.  The radiation is used to damage the DNA of the malignant cells in hopes of causing the cells to die or reproduce at a slower rate.  Radiation oncology is used as a palliative treatment (where cure is not possible and the aim is for local disease control or symptomatic relief) or as therapeutic treatment (where the therapy has survival benefit and it can be curative).

168.    Pursuant to the Social Security Act, Medicare pays physicians such as Defendant Sollaccio under the Medicare Physician's Fee Schedule for "all physicians' services." 42 U.S.C. § 1395w-4(a)(1).  The SSA defines "physicians' services" for the purposes of the Medicare Physician's Fee Schedule to include certain items and services described in the SSA.  42 U.S.C. § 1395w-4(j)(3).  Radiation oncology items and services provided pursuant to the SSA include: (1) diagnostic X-ray tests . . . diagnostic laboratory tests, and other diagnostic tests, 42 U.S.C. § 1395x(s)(3); and (2) X-ray, radium, and radioactive isotope therapy, including materials and services of technicians, 42 U.S.C. § 1395x(s)(4).

169.    In the Medicare Physician's Fee Schedule, which Medicare publishes yearly, all of the CPT codes are listed, together with the reimbursement Medicare allows for each code. Medicare lists the amount of reimbursement paid in the facility setting (i.e., hospital) and the non-facility setting (i.e., office).

170.    Medicare will make up to two payments for most radiation oncology procedures performed on an outpatient basis when the procedures qualify as "reasonable and necessary" – a technical component for performing the procedure and a professional component for reviewing the results or other physician work.

171.    The type of fee being claimed by a provider for a particular radiation oncology procedure is indicated by either the use or absence of a modifier with the applicable CPT code when completing the CMS 1500 claim form.  The modifier "TC" is utilized for the technical component of a service.  Modifier "26" is utilized for the professional component.  When a CPT code includes both a technical and a professional component, the absence of a modifier with the CPT code for the procedure indicates that physician's office provided both the technical and professional services.

172.    Fiscal intermediaries or carriers, such as First Coast, may issue decisions known as Local Coverage Determinations (LCDs) on whether to cover a particular service.  Such LCDs may also include requirements that a practitioner providing the service must complete to receive payment from Medicare.

173.    The predominant CPT codes at issue here relate to therapeutic radiation services covered under 42 U.S.C. § 1395x(s)(4).  In the Medicare Benefit Policy Manual defining "covered services," Medicare covers radiation therapy services furnished in an office or free standing radiation therapy center rendered under the "direct personal supervision" of a physician.  See Medicare Benefit Policy Manual, Chapter 15, Section 90 (Revised October 1, 2003).

174.    "Direct personal supervision" requires the supervising physician to "be in the area and immediately available to provide assistance and direction throughout the time the procedure is being performed." Id.

175.    If the supervising physician leaves the office or freestanding radiation therapy center, Medicare will not cover any radiation therapy services submitted by that supervising physician during his or her absence.  The availability of a physician by phone or other electronic means does not constitute direct personal supervision.

176.    Image-guided radiation therapy ("IGRT") is defined by CMS as a diagnostic service covered by Medicare pursuant to 42 U.S.C. § 1395x(s)(3).  IGRT is an alternative method of ensuring accurate positioning of the patient during radiation treatment.

177.    As a diagnostic service, supervision of IGRT services is subject to 42 CFR § 410.32(b)(3), which defines physician supervision for all diagnostic x-ray tests.  Section 410.32(b)(1) provides that "[s]ervices furnished without the required level of supervision are not reasonable and necessary . . . ."

178.    Prior to January 1, 2009, the particular IGRT service described by CPT Code 77421 was required to be performed under the personal supervision of a physician, 42 CFR § 410.32(b)(3)(iii), meaning that the "physician must be in attendance in the room during the performance of the procedure."

179.    Subsequent to January 1, 2009, CMS modified the supervision requirement for CPT Code 77421 to direct supervision, which is defined similarly to the direct personal supervision governing the majority of radiation therapy services.

180.    Pursuant to 42 CFR § 410.32(b)(3)(ii), "direct supervision" requires the physician to "be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure."

181.    Supervision is an essential element of IGRT services provided under CPT Code 77421 as the imaging is performed in the treatment room just prior to the patient receiving his or her daily radiation therapy treatment.  After the images are reviewed, the patient's position is adjusted as necessary to allow for the precise delivery of radiation to the tumor while minimizing the amount of radiation delivered to adjacent body areas.

182.   First Coast explicitly informs providers in the LCD that "IGRT must be performed by the radiation oncologist, medical physicist or trained radiation therapist under the supervision of the radiation oncologist.  The physician must supervise and review the procedure, as the guidance may show a shift beyond standard tolerances." See First Coast LCD, L29200, August 2009.

**Payment for Professional Services Performed by the Physician**

183.   In addition to a physician's supervision of these services, several of these codes include integral physician-specific components and/or professional services that must be rendered, documented, dated, and signed to make the Medicare claim properly payable.

184.   For instance, clinical treatment planning (CPT codes 77261 – 77263) reimburses physicians for evaluating the patient's overall medical condition and extent of disease, including a review and interpretation of multiple tests, before prescribing a specific type of radiation therapy for treatment.  These are professional-only codes that reflect the work of the physician. The appropriate code is determined by the complexity of the planning required.  See First Coast LCD, L29200, August 2009; ACRO Management Guide 2006; The ASTRO/ACR Guide to Radiation Oncology Coding 2007.

185.   After the plan is completed, simulations (CPT codes 77280 – 77295) ensure accurate treatment delivery through the use of simulation equipment (similar to an X-ray or MRI) to define the exact and correct treatment position for the patient.  The physician reviews these simulation images prior to treatment to ensure that the patient is properly aligned for the radiation beams to target the tumor.  Supporting documentation should include "patient positioning and immobilization device, target verification, possible utilizing [sic] radiographic studies, and a description of the physician's work." The appropriate code is determined by the

complexity of the simulation required.  See First Coast LCD, L29200, August 2009; see also ACRO Management Guide 2006; The ASTRO/ACR Guide to Radiation Oncology Coding 2007.

186.    A physician also must be directly involved in the use of treatment devices (CPT codes 77332 – 77334) to position the patient and ensure accurate radiation delivery.   In particular, the physician must be involved in the design, selection, and placement of devices during the patient's course of radiation therapy.   The appropriate code is determined by the complexity of the device(s) required.  See ACRO Management Guide 2006; The ASTRO/ACR Guide to Radiation Oncology Coding 2007.

187.    Additionally, certain difficult cases may require additional physician effort and work, which can be claimed as a special radiation treatment (CPT Code 77470).   First Coast cautions "that the use of this code implies a special treatment procedure with moderate physician work and very considerable practice expense…" This code is not appropriately billed on a routine basis.  See First Coast LCD, L29200, August 2009; see also ACRO Management Guide 2006; The ASTRO/ACR Guide to Radiation Oncology Coding 2007.

188.    Similarly, certain cases may require a special radiation physics consultation (CPT code 77370).   Although this is a technical-only code that reflects the work of the medical physicist, the documentation must reflect that the physician made a direct request to the physicist for a special consultative report and reviewed the report.  See First Coast LCD, L29200, August 2009; The ASTRO/ACR Guide to Radiation Oncology Coding 2007.

189.    During radiation treatment delivery, a physician may bill for radiation treatment management (CPT code 77427) to assess the patient's response to treatment and coordinate subsequent treatments.  Because this code reports only the work of the physician, the code has only a professional component.  Professional services include review of port films; review of

dosimetry, dose delivery, and treatment parameters; review of patient treatment set-up; and examination of the patient for medical evaluation and management. It is not appropriate to charge for the weekly radiation treatment management if the physician is not meeting face-to-face with the patient and documenting this evaluation weekly. See First Coast LCD, L29200, August 2009; ACRO Management Guide 2006; The ASTRO/ACR Guide to Radiation Oncology Coding 2007.

190. Medicare covers, and participating providers agree to submit, medically necessary claims for which the provider maintains adequate supporting documentation, justifying the treatment administered. 42 U.S.C. Section § 1395y(a)(1)(A). Medicare will not reimburse a physician for medically unnecessary services. See Medicare Claims Processing Manual, Chapter 23, Section 30(A) ("If a service is not reasonable and necessary to treat illness or injury for any reason, carriers consider the service non-covered notwithstanding the presence of a payment amount for the service in the Medicare fee schedule." (internal parenthetical omitted)).

191. Accordingly, documentation of the medical necessity of these services requires legible, complete, dated, timed, and authenticated or signed entries in the patient's medical record by the person responsible for providing or evaluating the services provided. See First Coast LCD, L29200, August 2009; CMS Medical Learning Network, Fact Sheet: Complying with Medicare Signature Requirements (March 2011); TRICARE Policy Manual 6010.57-M, Chapter 1, Section 5.1 (2008).

**Florida Medicaid Coding and Requirements for Radiation Oncology**

192. Radiation oncology is termed "radiation therapy" by Florida Medicaid, defined as teletherapy, radium, cobalt, brachytherapy, and other high-energy modalities and surface, intracavitary or interstitial applications. Florida Medicaid includes the following under radiation therapy:

*Initial treatment planning;*
*Initial and serial beam verification;*
*Central axis-based calculations; and*
*Normal follow-up care during radiation therapy and for 3 months after completion.*

*See* ACHA, Physician Services Coverage and Limitations Handbook, 2-96 (January 2004).

193.    Florida Medicaid will only pay for medical services when those services are medically necessary for the treatment of an injury, illness, or disease within the scope of the practice of medicine or osteopathic medicine as defined by state law.  Fla. Stat. § 409.905 (2007).

194.    All outpatient physician services provided to Florida Medicaid recipients must be performed by a physician or under the direct supervision of a physician.  See ACHA, Physician Services Coverage and Limitations Handbook, 1-7 (January 2004).

195.    Invasive radiological studies also require direct physician supervision to be reimbursed by Medicaid.  See ACHA, Physician Services Coverage and Limitations Handbook, 2-93 (January 2004).

196.    Direct supervision means the physician is on the premises when the services are rendered; and the physician reviews, signs and dates the medical record.  See ACHA, Physician Services Coverage and Limitations Handbook, 1-7, 2-93 (January 2004).

197.    The HCPCS and CPT Code system utilized by Medicare is also used by Florida. Medicaid providers to complete their claim forms to indicate the procedures for which they are seeking reimbursement.  Radiation oncology services are billed to Florida Medicaid utilizing CPT codes 77261 – 77799 (radiation oncology service codes).

198.    Florida Medicaid will make up to two payments for most radiation oncology procedures performed on an outpatient basis – a technical component for performing the procedure and a professional component for reviewing the results.

199.    The type of fee being claimed by a provider for a particular radiation oncology procedure is indicated by the use or absence of a modifier with the applicable CPT code when completing the CMS 1500 claim form.  The modifier "TC" is utilized for the technical component of a service.  Modifier "26" is utilized for the professional component.  Both the professional component and the technical component of a procedure cannot be billed if the same provider performed both components.  See ACHA, Physician Services Coverage and Limitations Handbook, 1-7, 2-94 – 2-95 (January 2004).

200.    Florida Medicaid only makes payment for the technical component for the following services: 77401-77417 (Radiation Treatment Delivery Services); 77370 (Special Medical Radiation Physics Consultation); and 77336 (Continuing Medical Physics Consult).  See ACHA, Physician Services Coverage and Limitations Handbook, 2-96 (January 2004).

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
Presentation of False Claims
(31 U.S.C. § 3729(a)(1)(A))

201.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 200 of this Complaint as if fully set forth herein.

202.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly presented or caused to be presented false or fraudulent claims to Federal and state healthcare programs for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

203.    The United States Government, or its authorized agent, unaware of the improper supervision orchestrated by Defendants, paid the false and/or fraudulent claims.

204.    By virtue of the false or fraudulent claims Defendants knowingly caused to be presented, the United States Government has suffered substantial monetary damages.

## SECOND CAUSE OF ACTION
Making or Using False Record Statement to Cause Claim to be Paid
(31 U.S.C. § 3729(a)(1)(B))

205.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 200 of this Complaint as if fully set forth herein.

206.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

207.    Defendants knowingly made or used false records or statements (a) to get false or fraudulent claims paid or approved by the Government, or (b) material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a). The false records or statements included, but were not limited to, the Defendants' false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting, including but not limited to the supervision requirements imposed by the NRC, CMS, and the state of Florida, and requirements to maintain their licenses to provide healthcare services to patients as well as claims submissions which misrepresent that the appropriate supervision was provided when Defendants it was not.

208.    By virtue of the false records or statements Defendants made or used, the United States Government has suffered substantial monetary damages.

### THIRD CAUSE OF ACTION
Making or Using False Record Statement to Avoid an Obligation to Refund
(31 U.S.C. § 3729(a)(1)(G))

209.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 200 of this Complaint as if fully set forth herein.

210.   As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to an obligation to pay or transmit money to the Government to knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

211.   Defendants knowingly made or used false records or statements (a) to get false or fraudulent claims paid or approved by the Government, or (b) material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a). The false records or statements included, but were not limited to the Defendants' false certifications and representations of full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting and claims submissions with misrepresent the supervision provided by Defendants to government insured patients.

212.   By virtue of the false records or statements Defendants made or used, the United States Government has suffered substantial monetary damages.

### FOURTH CAUSE OF ACTION
Violation of Florida False Claims Act
(Florida Statutes Section 68.081 et. seq.)

213.   Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 200 of this Complaint as if fully set forth herein.  As more particularly set

forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants violated the Florida False Claims Act, as found in Florida Statutes Section 68.081 et. Seq.

214.    Section 68.082 provides liability for any person who

    (a)    Knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

    (b)    Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

215.    Defendants knowingly violated section 68.082(a) and (b) and knowingly presented numerous false claims for payment and caused numerous false records to be made, used, and presented to the state of Florida in order to obtain payment.

216.    The state of Florida, by and through the Florida Medicaid program and other state health care programs, and unaware of the fraudulent and illegal practices of Defendants, paid the false and/or fraudulent claims.

217.    Compliance with applicable Medicare, Medicaid, and the other various other federal and state laws cited herein was an implied and also an express condition of payment of claims submitted to the state of Florida in connection with the fraudulent and illegal practices of Defendants.

218.    Given the structure of the health care systems, the false statements, representations, and records made by the Defendants had the potential to and did in fact influence the state of Florida's decisions on payment.

219.    The ultimate submission by the Defendants of false and/or fraudulent claims to the state Medicaid program was a foreseeable factor in the state of Florida's loss, and a consequence of the scheme.

220.    As a result of Defendants' violations of section 68.082 of the Florida Statutes, the state of Florida has been damaged.

221.    There are no bars to recovery under section 68.082, et seq, and, or in the alternative, Relator is an original source as defined therein.  Relator is a private person with direct and independent knowledge of the allegations of the Complaint and has brought this action pursuant to section 68.082, et seq, on behalf of the state of Florida.  As required, Relator satisfied all conditions precedent required by law to filing this Complaint.

222.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the state of Florida in the operation of its Medicaid program.

## VII.    DEMANDS FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States of America and the state of Florida, demands judgment against the Defendants, ordering that:

**As to the Claims on behalf of the United States:**

a.    Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b.    Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3729(d) of the False Claims Act and/or any other applicable provision of law;

c.    Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and,

d.    Relator be awarded such other and further relief as the Court may deem to be just and proper.

**As to the Claims on behalf of the state of Florida:**

a.    Pursuant to section 68.082, Defendants pay an amount equal to three times the amount of damages the state of Florida has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or

such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b.    Relator be awarded the maximum amount allowed pursuant to section 68.085 of Florida Statutes and/or any other applicable provision of law;

c.    Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by section 68.085 and any other applicable provision of the law; and

d.    Relator be awarded such other and further relief as the Court may deem to be just and proper.

**TRIAL BY JURY**

Relator hereby demands a trial by jury as to all issues.

Dated this 1st day of May, 2015.

Respectfully submitted,

John A. Yanchunis
Florida Bar No. 324681
jyanchunis@forthepeople.com
James D. Young
Florida Bar No. 567507
jyoung@forthepeople.com
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
201 One Tampa City Center, 7th Fl.
Tampa, Florida 33602
(813) 223-5505 (Telephone)
(813) 275-9295 (Facsimile)